**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

ROMAN ZRAZHEVSKIY and
TATIANA MIRONOVA,

Plaintiffs,

v.

WHITE RIVER ENERGY CORP., a
Nevada corporation,
JAY PUCHIR, an individual, and
E3 TAX, LLC d/b/a E3 FAMILY OFFICE, a
Missouri limited liability company,

Defendants.

Case No.: 5:26-cv-05135-DCF

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

# COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Roman Zrazhevskiy and Tatiana Mironova (together, "Plaintiffs"), by and through undersigned counsel, file this Complaint against Defendants White River Energy Corp. ("White River"), Jay Puchir ("Puchir"), and e3 Tax, LLC d/b/a e3 Family Office ("e3") and allege as follows:

## I. NATURE OF THE ACTION

1. This case arises from White River's sale to Plaintiffs of so-called *"Native American Tribe Trust Fund Federal Income Tax Credits"* (also marketed as *"Tribal Tax Credits," "Sovereign Tribal Federal Tax Credits," "Native American Tribal Credits," and "NATC,"* collectively the "Credits"). Defendants represented that the Credits were valid federal income tax credits issued to a Native American tribe and lawfully transferable to taxpayers, who could apply

them dollar-for-dollar against their federal income tax liabilities. Defendants induced Plaintiffs to wire $600,000 in exchange for $1,000,000 in face-value Credits.

2. Defendants' representations were false. The United States Internal Revenue Service has confirmed in writing to the United States Senate Committee on Finance that "these tax credits do not exist." The IRS has formally instructed its examiners through an Internal Revenue Manual procedural update to disallow any "Tribal Tax Credit," "Sovereign Tribal Federal Tax Credit," and "Native American Tribal Credit" claimed by taxpayers. The U.S. Department of the Treasury has stated publicly that "no such credits exist." The Cherokee Nation, the very tribe White River claims authorized the program, has issued a public cease-and-desist letter stating that "the Cherokee Nation did not authorize and is not associated with these tax credits." The U.S. Department of Justice and IRS Criminal Investigation have opened a federal criminal investigation into White River's sale of these Credits.

3. Despite these public determinations and Plaintiffs' written demand for rescission, White River, acting through its CFO and signatory Defendant Puchir, has refused to return Plaintiffs' money. White River's outside general counsel responded on April 29, 2026 by acknowledging that the IRS has rejected Plaintiffs' attempt to claim the Credits, but insisting that Plaintiffs continue to litigate the Credits' validity through IRS administrative processes that Plaintiffs' own tax counsel has warned could expose Plaintiffs to additional civil and criminal sanctions. The Tax Credit Purchase Agreement's tax-audit and indemnification provisions, which White River relies on to defer repayment, were drafted by White River and grant White River exclusive control over the defense of the Credits while limiting any later indemnity to a final, non-appealable judicial determination that, by operation of the IRS's public position, will never come.

4. Plaintiffs accordingly bring this action under Nevada law (the law selected by the parties' choice-of-law clause) for breach of contract, breach of express warranty, breach of the implied covenant of good faith and fair dealing, rescission and restitution, unjust enrichment, fraud in the inducement, negligent misrepresentation, and a declaration that the Tax Credit Purchase Agreement is rescinded, void, and unenforceable. Plaintiffs further seek to pierce the corporate veil and hold Defendant Puchir personally liable as the alter ego of White River. Plaintiffs seek restitution of $600,000, consequential damages, prejudgment interest, punitive damages, attorneys' fees and costs, and a jury trial.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the matter is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Plaintiffs Roman Zrazhevskiy and Tatiana Mironova are citizens of the State of Texas. Defendant White River is a Nevada corporation with its principal place of business located at 609 W. Dickson Street, Suite 102G, Fayetteville, Arkansas 72701, and is therefore a citizen of Nevada and Arkansas. Defendant Puchir, on information and belief, is a citizen of the State of Arkansas. Complete diversity exists between the Plaintiffs and Defendants.

7. This Court has personal jurisdiction over Defendants White River and Puchir. White River maintains its principal place of business in Fayetteville, Arkansas, transacts business in this State, and contractually consented to the exclusive jurisdiction of the state and federal courts located in Washington County, Arkansas. Defendant Puchir, on information and belief, resides and works in Fayetteville, Arkansas, executed the Tax Credit Purchase Agreement and related documents on White River's behalf from White River's Fayetteville office, and is the CFO who

controlled the wire instructions, marketing communications, and investor communications that gave rise to this dispute.

8. This Court also has specific personal jurisdiction over Defendant e3 under the Arkansas long-arm statute, Ark. Code Ann. § 16-4-101, and the Due Process Clause. e3 purposefully directed conduct at the State of Arkansas, and Plaintiffs' claims arise out of and relate to that conduct, in the following specific respects: (a) e3 entered into a written marketing and distribution agreement with White River, a corporation headquartered at 609 W. Dickson Street, Suite 102G, Fayetteville, Arkansas, under which e3 undertook to "establish a distribution network" for the Credits, as the Addendum executed by Plaintiffs expressly acknowledges; (b) e3 executed a mutual non-disclosure agreement with White River and accessed White River's Fayetteville, Arkansas data room and confidential offering documentation as a precondition to selling the Credits to Plaintiffs; (c) e3 transmitted to Plaintiffs the Tax Credit Purchase Agreement, the Addendum, and the related NATC offering materials — whose sole contractual counter-party, point of performance, and notice address are White River's Fayetteville, Arkansas office, and whose Section 9 forum-selection clause expressly designates "the state or federal courts located in Washington County, Arkansas" as the exclusive forum for any action concerning the Transaction; (d) e3 transmitted to Plaintiffs the wire instructions directing the $600,000 purchase price into White River's Bank of America Account No. 488084469166, an account controlled and administered from White River's Fayetteville, Arkansas office, and Plaintiffs wired those funds into Arkansas in reliance on e3's directions; (e) on information and belief, e3 received commissions, distribution fees, and other compensation totaling between $5,000,000 and $10,000,000 from White River out of purchaser funds wired into Arkansas-administered accounts — a figure White River's outside General Counsel confirmed in writing on May 15, 2026 ("e3

Family collected commissions and a tax planning fee from your clients as well as other third parties totaling between $5,000,000 and $10,000,000"); (f) e3, through Moriarty and Schreiber, coordinated directly with Defendant Puchir in Fayetteville, Arkansas regarding due diligence on the Credits, IRS-filing instructions, audit support, and post-sale investor communications, including the December 19, 2024 investor call Puchir hosted on White River's behalf from Arkansas; (g) e3 acted in concert with White River and Puchir, both Arkansas-based, pursuant to a common scheme to market, sell, and retain proceeds from the Credits; the Arkansas-based acts of White River and Puchir in furtherance of that scheme were reasonably foreseeable to and undertaken with the participation of e3; and (h) White River has expressly reserved "contribution and indemnity claims" against e3 and Mr. Moriarty for their "purchaser-facing distribution-network, diligence, and tax-support activities," confirming that e3 acted jointly with the Arkansas-based Defendants in the conduct giving rise to this action.

9. In the alternative, e3 is bound by Section 9 of the Tax Credit Purchase Agreement as a non-signatory whose conduct is "closely related to the contractual relationship." Marano Enters. of Kansas v. Z-Teca Rests., L.P., 254 F.3d 753, 757–58 (8th Cir. 2001). e3 was White River's contractual marketing and distribution partner for the Credits; e3 was compensated from the proceeds of the very Tax Credit Purchase Agreements it caused Plaintiffs and other purchasers to sign; and e3 itself transmitted to Plaintiffs the Agreement containing the Section 9 forum-selection clause. Enforcement of that clause against e3 in this Court is therefore foreseeable and proper.

10. Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Washington County, Arkansas, and because the parties contractually agreed in Section 9 of the Tax Credit Purchase Agreement (defined below) that "[a]ny action brought by any Party against the other concerning the

Transaction shall be brought only in the state or federal courts located in Washington County, Arkansas," and "irrevocably waive[d] any objection to jurisdiction and venue of any action instituted hereunder." Washington County is located within the Fayetteville Division of the Western District of Arkansas. See 28 U.S.C. § 83(b)(2).

11. The amount in controversy plainly exceeds $75,000. Plaintiffs paid $600,000 in connection with the Tax Credit Purchase Agreement and seek that amount in restitution and/or damages, plus consequential damages, prejudgment interest, punitive damages, and attorneys' fees.

## III. PARTIES

12. Plaintiff Roman Zrazhevskiy is an individual residing at 18009 Ranchland Hills Vista, Jonestown, Texas 78645. Mr. Zrazhevskiy is a citizen of the State of Texas.

13. Plaintiff Tatiana Mironova is an individual residing at 18009 Ranchland Hills Vista, Jonestown, Texas 78645. Ms. Mironova is a citizen of the State of Texas. Ms. Mironova is Mr. Zrazhevskiy's spouse and joint owner of the funds transferred to White River and is the joint principal in interest in the transaction described herein.

14. Defendant White River Energy Corp. is a Nevada corporation. Its principal executive offices are located at 609 W. Dickson Street, Suite 102G, Fayetteville, Arkansas 72701. White River's common stock trades over-the-counter under the ticker "WTRV."

15. Defendant Jay Puchir is, and at all relevant times was, the Chief Financial Officer of White River. On information and belief, Puchir resides and works in or near Fayetteville, Arkansas. Puchir is a Certified Public Accountant. Puchir personally signed the Tax Credit Purchase Agreement and related documents on White River's behalf.

16. Defendant e3 Tax, LLC, doing business as e3 Family Office ("e3"), is a Missouri limited liability company with its principal place of business at 906 S. Kirkwood Road, Kirkwood, Missouri 63122. On information and belief, all members of e3 are citizens of the State of Missouri, and e3 is therefore a citizen of Missouri for diversity purposes. The Addendum to the Tax Credit Purchase Agreement that Plaintiffs signed expressly identifies "e3 Tax, LLC (dba e3 Family Office)" as the holder of the marketing and distribution agreement with White River for the Credits. At all times relevant, John E. Moriarty (e3's founder and president), Mark C. Schreiber, CPA (an e3 senior partner and Plaintiffs' tax adviser), and Jessica Aubuchon (e3's client service coordinator), among others, acted as actual or apparent agents, employees, partners, or principals of e3 and within the scope of that agency. e3 purposefully directed offering materials and transaction documents into Arkansas, coordinated wire transfers into Arkansas-based bank accounts, and acted in concert with the Arkansas-based Defendants for the purpose of causing harm in this District. Complete diversity exists between Plaintiffs and Defendant e3.

## IV. FACTUAL ALLEGATIONS

### A. The Tribal-Tax-Credit Scheme.

17. Beginning no later than 2023, White River and Puchir promoted, marketed, and sold what they described as federal income tax credits purportedly issued by the United States Treasury to a Native American tribe and acquired by White River through a joint venture. White River publicly described the program in SEC filings as a "joint venture agreement" under which it had "received a total of $5,500,000,000 of United States federal income tax credits issued to a Native American tribe."

18. White River and Puchir disseminated marketing and offering materials representing, among other things, that: (a) the Credits were valid federal income tax credits issued by the U.S.

Treasury and lawfully transferable to U.S. taxpayers; (b) White River had acquired the rights to the Credits through a joint venture with the Cherokee Nation; (c) one "unit" of $100,000 face value of Credits could be purchased for $50,000 to $60,000; and (d) the resulting savings would be applied dollar-for-dollar against federal income tax liability for the year of purchase, producing returns of 43% to 67% on the buyer's investment.

19. White River and Puchir also disseminated detailed instructions purporting to tell purchasers how to claim the Credits on their federal income tax returns, including instructions to claim the Credits on Form 1040, Schedule 3, Part II, Line 13z ("Other Payments or Refundable Credits") by listing "Native American Tax Credits via EIN 88-0827332."

20. White River and Puchir further represented in offering materials that: (i) the Credits had been registered with the U.S. Treasury; (ii) the Credits were the subject of a tax opinion from a Washington, D.C. law firm; (iii) the Credits would be the subject of a private letter ruling from the IRS; and (iv) White River would indemnify any purchaser whose Credits were ever rejected by the IRS.

**B. Plaintiffs' Purchase.**

21. On or about March 28, 2024, in reliance on Defendants' representations, Plaintiffs entered into a written Tax Credit Purchase Agreement with White River (the "Agreement").

22. The Agreement was executed in DocuSign envelope ID 9EDF1F3D-8629-4698-A14F-AF040DB1A44D, transmitted by White River's and its distribution partner's "NATC Operations Team" operating from natcteam@e3familyoffice.com. White River's CFO, Defendant Puchir, was the seller-side signatory authority on the Agreement and on a contemporaneous Mutual Non-Disclosure Agreement attached to the Agreement as Exhibit B.

23. Section 1 of the Agreement provided: "The Seller agrees to sell and the Buyer agrees to purchase the Credits for the consideration contained in this Agreement and subject to the terms and conditions of this Agreement (the 'Transaction')." Section 2 of the Agreement set the total purchase price at $600,000 for $1,000,000 in face-value Credits.

24. In Section 3 of the Agreement, White River expressly represented and warranted to Plaintiffs, among other things, that "the Seller is the owner of the Credits, free of any claim, lien, security interest or encumbrance of any nature or kind and, as such, has the exclusive right and full power to sell, transfer and assign the Credits free of any such claim, lien, security interest or encumbrance," §3.1; that "[t]he Seller has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder," §3.2; and that "[t]here are no actions, suits, or proceedings pending or, to the best of the Seller's knowledge, threatened, which could in any manner restrain or prevent the Seller from legally selling the Credits pursuant to the terms and provisions of this Agreement," §3.5.

25. Section 5.1(b) of the Agreement provided, in part, that "the Seller will indemnify, defend and hold harmless the Buyer in the event that the U.S. Internal Revenue Service… makes a final binding determination, and the United States Tax Court confirms such determination in whole or in part and the times to appeal have expired, that the Credits are not 100% valid resulting in any losses to Buyer, including without limitation by virtue of any disallowance or recapture with respect to the Credits."

26. Section 5.4 of the Agreement ("Tax Audit") requires the buyer to give White River notice of any IRS audit involving the Credits within two business days, and grants White River "the exclusive right to settle" and the right to direct the buyer's appellate posture, while requiring

the buyer to take "all appropriate steps to contest any decisions of the IRS" and to "appeal to the appropriate tax court and/or federal appellate court following any adverse determination or ruling."

27. Section 9 of the Agreement contains a Nevada choice-of-law clause: "This Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder… shall be governed by and interpreted according to the internal laws of the State of Nevada without regard to choice of law considerations." Section 9 also provides for exclusive jurisdiction and venue in the state or federal courts located in Washington County, Arkansas. Nevada law also governs the claims asserted against e3. Although e3 did not sign the Agreement, e3 was expressly identified in the Addendum as White River's distribution partner for the Credits and knowingly participated in, profited from, and helped effectuate the very Transaction governed by the Agreement's Nevada choice-of-law clause. e3, through its agents, marketed the Credits to Plaintiffs, represented that it had performed due diligence, advised Plaintiffs to proceed, transmitted transaction-related communications and documents, and induced Plaintiffs to enter the Agreement and wire funds. The claims against e3 are therefore transaction-based, arise from the same operative facts as the claims against White River, and are sufficiently intertwined with the Agreement and Transaction to warrant application of Nevada law. Independently, Nevada law applies under general choice-of-law principles because the Transaction centered on a Nevada corporation's sale of the purported Credits under a contract selecting Nevada law, and e3's alleged misconduct was directed to inducing and facilitating that same Nevada-governed Transaction.

28. Plaintiffs paid the full $600,000 purchase price by wire transfer to White River's Bank of America account identified in Exhibit A to the Agreement (Account No. 488084469166), in accordance with White River's wire instructions, on or about March 28, 2024 through April 1, 2024.

29. In connection with the Agreement, Plaintiffs also signed an Addendum prepared by White River and its distribution agent fixing the price at $60,000 per unit for $100,000 in face-value Credits and confirming Plaintiffs' purchase of 10 units totaling $1,000,000 in face-value Credits.

**C. Federal and Tribal Authorities Have Confirmed That the Credits Do Not Exist.**

30. Defendants' representations that the Credits exist, were issued by the U.S. Treasury, were authorized by the Cherokee Nation, and are usable to offset federal income tax liability are false.

31. On March 21, 2025, the IRS confirmed in writing to the U.S. Senate Committee on Finance: "We can confirm that these tax credits do not exist. Taxpayers who claim credits that don't exist are subject to penalties and possible examination. Furthermore, promoters of these credits may be subject to civil or criminal penalties." (Email from IRS Office of Legislative Affairs to Senate Committee on Finance, Mar. 21, 2025.)

32. On August 7, 2025, the IRS issued IRM Procedural Update ts-03-0825-3547, titled "Tribal Tax Credit Scheme," which amended IRM 3.11.15.5.9 to instruct examiners that "[t]here is currently a potential scheme that was identified with Tribal Tax Credits being claimed," that "[t]hese credits are not allowed, regardless of the amount claimed or the type of documentation provided," and that the following are non-valid credits to be disallowed: "Tribal Tax Credit; Sovereign Tribal Federal Tax Credit or Native American Tribal Credit; Section 6418."

33. The U.S. Department of the Treasury publicly stated to Bloomberg in December 2024 that "no such credits exist."

34. The Cherokee Nation, the very tribe whose name White River uses to market the Credits, issued a cease-and-desist letter to White River stating that "the Cherokee Nation did not

authorize and is not associated with these tax credits and takes the misuse of its name seriously" and that the Cherokee Nation was "actively working in partnership with state and federal agencies to prevent further harm to the victims of this scheme."

35. The U.S. Department of Justice and IRS Criminal Investigation have opened a federal criminal investigation into White River and its agents in connection with the sale of the Credits, and have issued grand-jury subpoenas to numerous individuals and entities involved in the scheme.

36. On January 29, 2026, U.S. Senator Ron Wyden, then-Ranking Member of the Senate Committee on Finance, sent a letter to the Chairman of the U.S. Securities and Exchange Commission detailing the foregoing facts, identifying the criminal investigation as a material development that White River had concealed from investors, and calling on the SEC to consider proceedings under Section 12(j) of the Exchange Act to revoke White River's securities registration.

37. Other purchasers of the Credits have publicly attested that the IRS has rejected their attempts to claim the Credits and has assessed accuracy-related penalties as a result. In one such matter, a Florida couple obtained a default judgment against White River; in another, a Texas purchaser is presently litigating in federal court for refund of $750,000 paid for these same purported Credits.

**D. Plaintiffs' Demand for Rescission and White River's Refusal.**

38. On April 16, 2026, through undersigned counsel, Plaintiffs sent White River a written demand for rescission of the Agreement, return of the $600,000 purchase price, and payment of all additional sums necessary to make Plaintiffs whole.

39. On April 29, 2026, Brian Ettinger of the Law Office of Brian Ettinger, PLLC, identifying himself as White River's outside general counsel, responded on behalf of White River.

40. In the response letter, White River, through Mr. Ettinger, did not deny that the IRS has rejected Plaintiffs' attempt to claim the Credits or that the IRS publicly maintains that the Credits do not exist. Instead, White River expressly "dispute[d] the IRS' decision in not allowing your client these tax credits," characterized the Credits as "non-codified Tribal Tax Credits," acknowledged that "Senator Wyden and the other Democratic Senators on the Senate Finance Committee [went] after Billy Long during his confirmation hearing" about the Credits, and stated that Plaintiffs "should be working with White River Energy Corp as other third parties are doing" and "wait and see if White River Energy Corp is successful in reaching an amicable resolution with the IRS through its legal and political efforts." White River refused to refund any portion of the purchase price.

41. Plaintiffs' tax counsel has separately advised Plaintiffs that the IRS may treat further submissions advancing the tribal-tax-credit position as frivolous and subject to penalties under, *inter alia,* Internal Revenue Code § 6702, and that the prudent course is to pay the outstanding tax and withdraw any pending IRS process rather than continue pressing the underlying position. White River has no good-faith basis to insist that Plaintiffs continue to engage in conduct that Plaintiffs' own tax counsel has warned may be sanctionable, and that the IRS has formally instructed examiners to disallow, merely to preserve a contingent indemnity that, by White River's own admission, will not ripen until and unless the IRS reverses course.

42. On May 15, 2026, White River, again through its outside general counsel Mr. Ettinger and outside litigation counsel Michael Wynne and Cameron Powell, sent a further response. The May 15, 2026 letter denies the demand on contract grounds but contains material admissions, including (a) that the Credits are "non-codified Tribal Tax Credits"; (b) that the Taxpayer Advocate Service has "handled certain third-party IRS denials" involving the Credits; (c) that the IRS's

position has resulted in numerous "Claimants" in Plaintiffs' position; (d) that White River understands "e3 Family collected commissions and a tax planning fee from your clients as well as other third parties totaling between $5,000,000 and $10,000,000"; and (e) that White River reserves "contribution and indemnity claims" against e3 and Mr. Moriarty for their "purchaser-facing distribution-network, diligence, and tax-support activities." The May 15, 2026 letter also concedes that White River's contractual indemnification position under Section 5.1(b) is conditioned on a final IRS determination "confirm[ed]" by the United States Tax Court after appeal rights have expired, a sequence that, given the IRS's and Treasury's public position that the Credits do not exist and the IRS's formal disallowance of the Credits as a "Tribal Tax Credit Scheme," cannot ripen in Plaintiffs' favor.

**E. Asset-Diversion and Solvency Concerns.**

43. White River has not filed a Form 10-K annual report with the SEC since June 29, 2023, and has not filed a Form 10-Q quarterly report since March 15, 2024. White River has missed at least eight consecutive quarterly periodic-report deadlines and has not filed any periodic report with the SEC since October 2024. The OTC Markets Group has flagged White River as "delinquent SEC reporting" and "not current in its reporting obligations under Section 13 or 15(d) of the Exchange Act."

44. White River has publicly disclosed in SEC filings that it has earned at least $24 million in proceeds from the sale of the Credits. According to the Senate Finance Committee's investigation, the actual proceeds may exceed $100 million, and White River and its agents have collected purchase funds from many other investors that have not been refunded notwithstanding the IRS's public position that the Credits do not exist.

45. On information and belief, White River and Puchir have transferred, depleted, and otherwise diverted Plaintiffs' funds and other purchasers' funds to insiders, related entities, and personal use, and lack the financial wherewithal to satisfy the indemnification obligation that they invoke as a justification for refusing to refund Plaintiffs.

**F. Defendant Puchir Is the Alter Ego of White River.**

46. On information and belief, White River is dominated and controlled by Defendant Puchir, who serves as its CFO, signs all material agreements on its behalf, controls its bank accounts, controls its public investor communications, and exercises practical control over its day-to-day operations and the disposition of its funds.

47. On information and belief, there is such a unity of interest and ownership between Puchir and White River that Puchir has commingled funds with the corporation, has treated corporate assets as his own, has caused White River to fail to observe corporate formalities (including by causing it to fail to file required SEC periodic reports for more than two consecutive years), and has caused White River to be undercapitalized in light of the magnitude of the Credits-sale liabilities Puchir has caused the corporation to incur.

48. Adherence to the corporate fiction of White River as a separate entity, under the circumstances of this case, would sanction the fraud described in this Complaint and would promote a manifest injustice to Plaintiffs and other defrauded purchasers, who have wired millions of dollars to White River in reliance on representations Puchir personally made or directed and which Puchir knew to be false or made without an adequate basis.

**G. e3 Acted as White River's Promoter and Made Independent Misrepresentations to Plaintiffs.**

49. On information and belief, e3 served as White River's primary distribution partner for the Credits. The Addendum to the Agreement expressly identifies "e3 Tax, LLC (dba e3 Family Office)" as the entity that "obtained" from White River an "NDA and marketing agreement" to "establish a distribution network" for the Credits. The Addendum also acknowledges that e3's "fees for services are included in this current price offering." On information and belief, e3 received compensation, directly or indirectly, from the funds Plaintiffs wired to White River, including, at minimum, a $10,000 "due diligence fee" and additional commission or referral consideration.

50. Plaintiffs were e3 clients at the time of the Transaction. e3 introduced Plaintiffs to the Credits, performed and represented to have performed due diligence on the Credits, and recommended that Plaintiffs purchase the Credits as a tax-mitigation strategy. e3, through its agents Moriarty and Schreiber, acted as Plaintiffs' tax and financial adviser in connection with the recommendation and execution of the Transaction.

51. On December 19, 2023, Jessica Aubuchon, acting on behalf of e3, transmitted to Plaintiffs an email titled "2023 End of Year Tax Strategy — Possible Tax CREDITS sourced by e3 Family Office for select clients," copying Mr. Moriarty, Mr. Schreiber, and Crystal Bridgeman. The December 19, 2023 email represented to Plaintiffs, inter alia, that: (a) the "source of these tax credits is the Cherokee Nation, and they are considered a Native American Tribe Trust Fund Tax Credit"; (b) authority for the Credits could be found "in the Internal Revenue Code under: Title 25, Chapter 4, Subchapter 3, Section 161A"; (c) the Credits provided "a 2 to 1 tax benefit or 2X multiple on your money when your 2023 federal personal tax return is filed"; and (d) White River had "acquired the rights to these tax credits" through a joint venture with the Cherokee Nation. Title 25 of the United States Code is the Indian-Affairs title, not the Internal Revenue Code, and

no "Section 161A" of Title 25 authorizes the "Native American Tribe Trust Fund Tax Credit" the email describes.

52. On December 26, 2023, Mark C. Schreiber, CPA, e3's "Senior Partner & Registered Representative," sent Plaintiffs an email titled "Final Tax Strategy for 2023" recommending that Plaintiffs purchase the Credits, stating, inter alia, that "[w]e have completed our due diligence and are ready to move forward," that "[t]he Indian Tribal Trust Fund Credit (attached) is a 2-1 Credit (not a deduction)," that "[i]t is very rare for us to have access to this at a 50% discount but through John's contacts we have it available," and that Plaintiffs should select the "amount you want" and execute documents via DocuSign. The email further stated, "we are charging a due diligence fee of $10,000 for 3 units or more. This will be our total compensation."

53. On January 8, 2024, Mr. Schreiber wrote to Mr. Moriarty (copying Plaintiff Roman Zrazhevskiy), in response to Plaintiff's expressed concern about "the risk if White River going out of business in the scenario the tax credits are not approved by the IRS and White River not being able to pay back the investment," that "I indicated I am very comfortable with White River based on our due diligence and near 100% certain on the tax credit acceptance by the IRS."

54. Beginning in or around January 2024 and continuing through the closing of the Transaction, Mr. Moriarty also transmitted misrepresentations directly to Plaintiff Roman Zrazhevskiy by text message, including, inter alia, that "[t]here is nothing about these tax credits where they have to be 'approved' by the IRS," that "[t]his is not like a conservation easement where the IRS can challenge the valuation . . . these credits are already in the tax code . . . since the early 2000's actually," that "[t]he balance sheet of White [River] is backing the tax credits," that "[t]he PLR is only needed for institutional buyers of the credits," and that "the purchase agreement indemnifies the purchaser and there is audit protection."

55. On information and belief, each of the foregoing representations by Moriarty, Schreiber, and Aubuchon was made on behalf of e3, within the scope of their authority and employment as e3's agents and/or members. Each representation was false. No provision of the Internal Revenue Code authorizes the existence, sale, or transfer of "Tribal Tax Credits," "Sovereign Tribal Federal Tax Credits," "Native American Tribal Credits," or any "Native American Tribe Trust Fund Tax Credit"; Title 25 of the United States Code does not contain any "Section 161A" authorizing such credits; the Cherokee Nation did not authorize or associate itself with the offering; and the Credits were not "already in the tax code . . . since the early 2000's."

56. On information and belief, e3 knew, or with the exercise of reasonable diligence reasonable for a self-described "family office" that charged a "due diligence fee" would have known, that each of those representations was false. e3 nevertheless promoted, recommended, and facilitated the sale of the Credits to Plaintiffs for its own pecuniary gain.

57. Plaintiffs justifiably relied on e3's representations. Plaintiffs are not tax attorneys, tax accountants, or securities professionals. Plaintiffs engaged Mr. Schreiber as their CPA, and engaged e3 as a "family office" for tax-strategy advice, precisely because Plaintiffs were not qualified to evaluate complex tax-credit strategies independently. e3, Moriarty, and Schreiber held themselves out as having the expertise, the "due diligence," and the "contacts" necessary to evaluate the Credits, and Plaintiffs reposed trust and confidence in them on that basis.

58. On information and belief, e3 acted in concert with White River and Puchir pursuant to a common understanding to market and sell the Credits to taxpayer-purchasers including Plaintiffs, to retain payments from those purchasers, and to share in the proceeds. e3 had a separate, non-employer relationship with White River, distinct from any employee-employer relationship, and was a third-party promoter and distribution partner of White River.

## COUNT I

### Breach of Contract (Against White River)

59. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

60. The Agreement is a valid and enforceable contract between Plaintiffs and White River. Plaintiffs performed all of their obligations under the Agreement, including by wiring the full $600,000 purchase price to White River.

61. White River materially breached the Agreement, including by breaching the express representations and warranties in Section 3 of the Agreement, by selling Plaintiffs purported Credits that do not legally exist, that White River had no right or power to sell, transfer, or assign, and which the IRS has formally instructed examiners to disallow as part of an "Tribal Tax Credit Scheme." White River's representations and warranties under §§3.1, 3.2, and 3.5 of the Agreement, that White River was "the owner of the Credits, free of any claim, lien, security interest or encumbrance," had "the exclusive right and full power to sell, transfer and assign the Credits," had "full power and authority" to perform the Agreement, and was not subject to any "actions, suits, or proceedings" that could prevent it from "legally selling the Credits," were untrue at the time made and at the time of closing, and White River has refused to make Plaintiffs whole.

62. White River further breached the Agreement by failing and refusing to deliver to Plaintiffs the lawful, valid, and transferable federal income tax credits that the Agreement purported to convey, and by failing and refusing to indemnify Plaintiffs upon the IRS's effective rejection of the Credits.

63. Under Nevada law, a plaintiff establishes breach of contract by proving (i) the existence of a valid contract; (ii) performance or excuse of nonperformance by the plaintiff; (iii) breach by the defendant; and (iv) damages caused by the breach.

64. As a direct and proximate result of White River's breaches, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to the $600,000 purchase price, prejudgment interest, consequential damages, professional fees and costs incurred in addressing the IRS's rejection of the Credits, and any tax penalties or related amounts assessed against Plaintiffs in connection with their attempt to claim the Credits.

## COUNT II

**Breach of Express Warranty (Against White River)**

65. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

66. Section 3 of the Agreement contains express written representations and warranties made by White River to Plaintiffs as part of the Transaction, including those quoted above in §§3.1, 3.2, 3.5, and 5.1(a)–(b). Those representations and warranties were a material part of the inducement for Plaintiffs to enter the Agreement and pay $600,000.

67. Each of the foregoing representations and warranties was false when made and remained false at the time of closing. White River was not "the owner of the Credits, free of any claim, lien, security interest or encumbrance," because no such credits existed for it to own; White River had no "exclusive right and full power to sell, transfer and assign" non-existent credits; and threatened proceedings, including the existing federal criminal investigation and the Cherokee Nation's cease-and-desist, restrained White River from "legally selling the Credits" within the meaning of §3.5.

68. Plaintiffs were damaged as a direct and proximate result of White River's breach of those express warranties in an amount to be proven at trial, including but not limited to the full $600,000 purchase price, consequential damages, prejudgment interest, professional fees, and tax-related amounts described above.

## COUNT III

**Breach of the Implied Covenant of Good Faith and Fair Dealing (Against White River)**

69. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

70. Every contract under Nevada law contains an implied covenant of good faith and fair dealing that obligates each contracting party to act in a manner that is faithful to the purpose of the contract and the justified expectations of the other party.

71. White River breached its implied covenant of good faith and fair dealing by, among other things: (a) drafting and inserting into the Agreement an indemnification provision (§5.1(b)) that conditions payment on a "final binding determination" "confirm[ed]" by the United States Tax Court, a condition that, given the IRS's formal disallowance of the Credits and the Treasury Department's public position that no such credits exist, can never be satisfied; (b) drafting and inserting into the Agreement a "Tax Audit" provision (§5.4) that purports to require Plaintiffs to contest the validity of the Credits at White River's direction notwithstanding that Plaintiffs' tax counsel has advised that doing so risks frivolous-submission penalties; (c) refusing to refund Plaintiffs' money after the IRS confirmed that the Credits do not exist; and (d) instructing Plaintiffs through outside counsel to "wait and see" while White River pursues "legal and political efforts" against the IRS, despite knowing those efforts are highly unlikely to succeed and that delay further depletes the corporation's ability to make Plaintiffs whole.

72. White River's conduct contravenes the spirit and intent of the Agreement and Plaintiffs' justified expectations. Plaintiffs have suffered damages as a direct and proximate result, in an amount to be proven at trial.

## COUNT IV

**Rescission and Restitution (Against White River) (Pleaded in the Alternative)**

73. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

74. Under Nevada law, rescission is an equitable remedy that totally abrogates a contract and seeks to place the parties in the position they occupied prior to executing the contract. Rescission is appropriate where a party was induced to contract by misrepresentation; the standard for obtaining rescission is less exacting than the standard for a tort action for damages, and even an unreasonable reliance on a misrepresentation may support rescission where the misrepresentation was made intentionally by the other party.

75. White River induced Plaintiffs to enter the Agreement and to wire $600,000 by means of misrepresentations of existing fact, including, at minimum, the express written representations in Section 3 of the Agreement, that the Credits existed, were valid, were owned by White River, were transferable, and could be applied dollar-for-dollar against federal income tax liability.

76. Each of those representations was false. The IRS has confirmed in writing that "these tax credits do not exist," the Treasury Department has stated publicly that "no such credits exist," the IRS has formally instructed examiners to disallow the Credits as a "Tribal Tax Credit Scheme," the Cherokee Nation has disavowed any authorization, and the DOJ has opened a criminal investigation into the sale of the Credits.

77. Plaintiffs relied on White River's representations to their detriment, paying $600,000 in exchange for purported Credits that have no legal existence. Plaintiffs are entitled to rescission of the Agreement and restoration of the status quo ante, including return of the full $600,000 purchase price plus consequential damages and prejudgment interest.

78. Plaintiffs hereby tender any consideration received under the Agreement and any rights they hold under the Agreement (which Plaintiffs allege have no legal value) for return to White River upon rescission, on such terms as the Court deems equitable.

79. Section 4.6 of the Agreement does not bar rescission. As a matter of Nevada law, an integration or non-reliance clause cannot insulate a seller from rescission for misrepresentation that goes to the existence or essential nature of the subject matter of the contract. Section 4.6 also contains its own express carve-out preserving Plaintiffs' reliance on White River's "express representations, warranties and covenants in this Agreement," including those in Sections 3.1, 3.2, 3.5, and 5.1, on which Plaintiffs in fact relied.

## COUNT V

**Unjust Enrichment / Restitution (Against All Defendants) (Pleaded in the Alternative)**

80. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

81. Under Nevada law, Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.

82. Plaintiffs conferred a benefit on White River and, on information and belief, on Puchir, in the form of the $600,000 wired to White River's Bank of America Account No. 488084469166. Defendants appreciated and accepted that benefit and continue to retain it.

83. It would be inequitable for Defendants to retain the $600,000 because Defendants delivered nothing of legal value in return: the purported Credits do not exist as a matter of federal tax law, are formally disallowed by the IRS, and were never authorized by the Cherokee Nation.

84. Plaintiffs are aware that Nevada generally does not permit unjust-enrichment recovery where an express written contract governs the same subject matter. This count is therefore pleaded strictly in the alternative to Counts I through IV. To the extent that the Court determines that the Agreement is void, voidable, unenforceable, illegal, rescinded, or otherwise does not provide an adequate legal remedy, Plaintiffs are entitled to restitution of the $600,000, plus prejudgment interest, on a theory of unjust enrichment.

## COUNT VI

**Fraud in the Inducement (Against** Defendant White River Energy Corp**)**

85. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

86. Under Nevada law, the elements of fraud in the inducement are: (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false (or knowledge that the defendant had an insufficient basis for making the representation); (3) the defendant's intention thereby to induce the plaintiff to consent to the contract's formation; (4) the plaintiff's justifiable reliance on the misrepresentation; and (5) damage to the plaintiff resulting from the reliance.

87. Causes of action for fraud in the inducement and breach of contract may be pursued as distinct claims with separate and consistent remedies. Nevada law permits a fraudulent-inducement claim that does not merely contradict the express terms of an integrated contract, and extrinsic or oral evidence is admissible to prove fraud in the inducement of an agreement, notwithstanding the parol-evidence rule.

88. Defendants made each of the following representations to Plaintiffs (the "Misrepresentations") before and during March 2024 in connection with the Transaction: (a) that the Credits were valid federal income tax credits issued to a Native American tribe by the U.S. Treasury and lawfully transferable to U.S. taxpayers; (b) that White River was "the owner of the Credits, free of any claim, lien, security interest or encumbrance," Agreement §3.1; (c) that White River had "the exclusive right and full power to sell, transfer and assign the Credits," id.; (d) that White River had "full power and authority" to perform the Agreement, id. §3.2; (e) that there were no actions, suits, or proceedings, pending or threatened, that could prevent White River from "legally selling the Credits," id. §3.5; (f) that purchasers should claim the Credits on Form 1040, Schedule 3, Part II, Line 13z as "Native American Tax Credits via EIN 88-0827332"; (g) that the Credits would offset the purchaser's federal income tax liability dollar-for-dollar; (h) that the Credits had been registered with the U.S. Treasury and were the subject of, or would imminently be supported by, a tax opinion from a Washington, D.C. law firm and a forthcoming private letter ruling from the IRS; and (i) that purchasers were protected by White River's indemnification.

89. The Misrepresentations were false. Among other things: no provision of the Internal Revenue Code authorizes the existence, sale, or transfer of "Tribal Tax Credits," "Sovereign Tribal Federal Tax Credits," or "Native American Tribal Credits"; the Treasury Department has confirmed that no such credits exist; the IRS has formally instructed examiners to disallow such

credits as part of a "Tribal Tax Credit Scheme"; the Cherokee Nation did not authorize, and is not associated with, the program; and the DOJ has opened a criminal investigation into the very sales transaction at issue.

90. White River made the Misrepresentations through (i) the offering and marketing materials it caused to be transmitted to Plaintiffs in connection with the Transaction, including the Agreement, the Addendum, and the "Background on this Opportunity" / NATC explanatory materials packaged with the Agreement; (ii) its execution and delivery of the Agreement and the Addendum, including the express representations and warranties in Sections 3.1, 3.2, 3.5, and 5.1(b); and (iii) its continuing failure to correct or retract the Misrepresentations after federal authorities publicly disclosed their position that the Credits do not exist.

91. White River knew at the time it made and reaffirmed the Misrepresentations that they were false, or, alternatively, made the Misrepresentations with reckless disregard for their truth and without an adequate basis. White River's knowledge is imputed from the knowledge of its officers, including its CFO Puchir, who is a Certified Public Accountant; who had access to the underlying documentation (or absence thereof) supporting the Credits; and who received the Cherokee Nation's cease-and-desist letter and was on notice of the Treasury Department's public statements. After Bloomberg published "Rich People buy Tax Credits Treasury Says Don't Exist" on December 19, 2024, Puchir hosted an investor call on White River's behalf during which one financial advisor stated that "every single one" of the Credits sold by him was being rejected by the IRS; that information was known to White River through Puchir and was not corrected. White River nonetheless continued to sell the Credits and to retain the proceeds, including those received from Plaintiffs.

92. White River intended to induce Plaintiffs to enter the Agreement and to wire $600,000 to White River's account based on the Misrepresentations. Plaintiffs were the intended recipients of the offering materials and were the intended payors under the Agreement.

93. Plaintiffs justifiably relied on the Misrepresentations. Plaintiffs are not tax attorneys, accountants, or securities professionals, and they had no reason to suspect that a publicly traded company and its CPA-CFO were marketing a product that the U.S. Treasury and IRS would later confirm "do[es] not exist."

94. Section 4.6 of the Agreement does not bar this claim. The fraud claim is not premised on extra-contractual statements that contradict the Agreement; it is premised on the falsity of White River's own express representations and warranties in Sections 3.1, 3.2, 3.5, and 5.1(b), on which Section 4.6 expressly permits Plaintiffs to rely ("except that the Buyer has relied upon the Seller's express representations, warranties and covenants in this Agreement"). Nevada law also permits fraud-in-the-inducement claims notwithstanding an integration clause where, as here, the fraud does not merely contradict the Agreement's express terms. Extrinsic evidence is admissible to prove fraud in the inducement notwithstanding the parol-evidence rule. In any event, a non-reliance clause cannot, as a matter of Nevada law and basic equity, insulate a seller from fraud about the existence or legal validity of the subject matter of the contract.

95. Plaintiffs have been damaged as a direct and proximate result of the Misrepresentations in an amount to be proven at trial, including the $600,000 purchase price; consequential damages, including but not limited to professional fees, IRS-related penalties and interest, and the costs of pursuing rescission and restitution; prejudgment interest; and punitive damages. White River's conduct was willful, malicious, and oppressive within the meaning of NRS 42.005, justifying an award of punitive damages.

## COUNT VII

**Negligent Misrepresentation (Against** Defendant White River Energy Corp**) (Pleaded in the Alternative)**

96. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

97. Under Nevada law, which has adopted Restatement (Second) of Torts § 552, one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

98. In the alternative to Count VI, White River supplied false information for the guidance of Plaintiffs in a transaction in which White River had a pecuniary interest, the sale of the Credits to Plaintiffs. White River failed to exercise reasonable care or competence in obtaining or communicating the information, including by failing to verify (a) whether any provision of the Internal Revenue Code authorized the sale or transfer of the Credits; (b) whether the Cherokee Nation had authorized the program; and (c) whether the Credits had been registered with the U.S. Treasury, before marketing and selling the Credits as valid federal income tax credits.

99. Plaintiffs justifiably relied on the false information and have suffered pecuniary loss as a result, including the $600,000 purchase price, consequential damages, professional fees, and tax-related amounts described above.

## COUNT VIII

**Alter Ego / Piercing the Corporate Veil (Against Defendant Jay Puchir)**

100. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

101. The corporate veil may be pierced and an officer held individually liable where: (1) the corporation is influenced and governed by the person asserted to be its alter ego; (2) there is such a unity of interest and ownership that one is inseparable from the other; and (3) adherence to the corporate fiction would, under the circumstances, sanction fraud or promote injustice. Indicative factors include commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities.

102. On information and belief, White River is influenced and governed by Defendant Puchir. Puchir is the CFO; signs material agreements; controls the corporation's bank accounts and wire instructions; controls investor communications; and exercises practical control over the corporation's day-to-day operations and the disposition of its funds, including the $600,000 paid by Plaintiffs.

103. On information and belief, there is such a unity of interest and ownership between Puchir and White River that the two are inseparable. Among other things, Puchir has caused White River to fail to file required SEC periodic reports for more than two years, has caused White River to disregard the corporate formalities that would protect public investors and counterparties, has commingled and diverted corporate funds, and has caused White River to be undercapitalized in light of the Credits-sale liabilities he caused it to incur.

104. Adherence to the corporate fiction of White River as a separate entity, under the circumstances of this case, would sanction the fraud described in this Complaint and would promote a manifest injustice to Plaintiffs and to other defrauded purchasers.

105. Plaintiffs accordingly are entitled to a judicial declaration that Puchir is the alter ego of White River, and to hold Puchir jointly and severally liable for any judgment entered against White River on Counts I through VII.

**COUNT IX**

**Declaratory Judgment (Against White River and Puchir)**

106. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

107. An actual, immediate, and substantial controversy exists between Plaintiffs and Defendants White River and Puchir regarding the parties' respective rights and obligations under the Agreement. Plaintiffs contend that the Agreement is void, voidable, and/or rescinded for the reasons set forth above. White River and Puchir contend that the Agreement remains in force and that Plaintiffs must continue to litigate the validity of the Credits with the IRS as a precondition to any refund. The Court's declaration is necessary and appropriate to resolve that controversy under 28 U.S.C. §§ 2201-2202.

108. Plaintiffs request a declaration that: (a) the Agreement is rescinded, void, and/or unenforceable; (b) Plaintiffs are entitled to immediate restitution of the $600,000 purchase price; (c) Plaintiffs are not required as a matter of contract or law to pursue or continue any IRS administrative process, Tax Court proceeding, refund claim, or appeal as a condition of recovering their money; and (d) Defendant Puchir is the alter ego of White River.

**COUNT X**

**Fraud / Fraudulent Misrepresentation (Against Defendant e3 Tax, LLC d/b/a e3 Family Office)**

109. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

110. Under Nevada law, the elements of fraud / fraudulent misrepresentation are: (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false (or knowledge that the defendant had an insufficient basis for making the representation); (3) the defendant's intention to induce the plaintiff to act or refrain from acting in reliance on the misrepresentation; (4) the plaintiff's justifiable reliance; and (5) damages resulting from that reliance.

111. e3, acting through Moriarty, Schreiber, Aubuchon, and other agents within the scope of their authority and employment, made the false representations described above, including but not limited to: that the Credits existed under federal law; that authority for the Credits could be found in "Title 25, Chapter 4, Subchapter 3, Section 161A" of "the Internal Revenue Code"; that the Credits were "already in the tax code . . . since the early 2000's"; that they were "Native American Tribe Trust Fund Tax Credit[s]" sourced from the Cherokee Nation; that White River had "acquired the rights" to the Credits; that e3 had "completed [its] due diligence and [was] ready to move forward"; that Mr. Schreiber was "near 100% certain on the tax credit acceptance by the IRS"; that there was "nothing about these tax credits where they have to be 'approved' by the IRS"; and that "the balance sheet of White [River] is backing the tax credits" (the "e3 Misrepresentations").

112. The e3 Misrepresentations were false when made. e3 knew, or with the exercise of reasonable diligence consistent with its representation that it had performed and was charging for "due diligence" would have known, that each was false. In the alternative, e3 made the e3 Misrepresentations with reckless disregard for their truth and without an adequate basis.

113. e3 intended that Plaintiffs rely on the e3 Misrepresentations and execute the Tax Credit Purchase Agreement and Addendum with White River. e3 stood to profit, and on information and belief did profit, from Plaintiffs' reliance through the "due diligence" fee, commissions, and other compensation paid out of Plaintiffs' funds.

114. Plaintiffs justifiably relied on the e3 Misrepresentations in deciding to purchase the Credits and wire $600,000 to White River. A contracting party has a right to rely on an express statement of existing fact, the truth of which is known to the party making the representation and unknown to the other party; the recipient is under no obligation to investigate and verify the statement. Plaintiffs' reliance was particularly justifiable because e3 held itself out as having performed due diligence, expressly charged for that diligence, and held the role of Plaintiffs' trusted tax adviser.

115. As a direct and proximate result of the e3 Misrepresentations, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to the $600,000 purchase price, the $10,000 "due diligence fee" paid to e3, consequential damages, professional fees, IRS-related penalties and interest, prejudgment interest, and punitive damages. e3's conduct was willful, malicious, oppressive, and undertaken with conscious disregard of Plaintiffs' rights within the meaning of NRS 42.005, warranting an award of punitive damages.

## COUNT XI

### Negligent Misrepresentation (Against Defendant e3) (Pleaded in the Alternative)

116. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

117. Under the Restatement (Second) of Torts § 552, "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary

interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

118. In the alternative to Count X, e3 supplied the e3 Misrepresentations as false information to Plaintiffs in a transaction in which e3 had a pecuniary interest. e3 failed to exercise reasonable care or competence in obtaining or communicating the e3 Misrepresentations, including by failing to verify, before recommending the Transaction, that any provision of federal law actually authorized the Credits, that the Cherokee Nation had authorized the program, and that the U.S. Treasury had registered or otherwise approved the Credits.

119. Plaintiffs justifiably relied on the e3 Misrepresentations and have suffered pecuniary loss as a result, including the $600,000 purchase price, the $10,000 due-diligence fee, consequential damages, professional fees, and tax-related amounts described above.

**COUNT XII**

**Professional Negligence / Accountant Malpractice (Against Defendant e3)**

120. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

121. A claim for professional negligence requires: (1) a duty to use the skill, prudence, and diligence that other members of the profession commonly possess and exercise; (2) breach of that duty; (3) proximate causation between the negligent conduct and the resulting injury; and (4) actual loss or damage.

122. At all relevant times, e3 acted as Plaintiffs' tax adviser and accountant in connection with the Transaction. Mark C. Schreiber, a Certified Public Accountant, held himself out as

Plaintiffs' CPA and partner of e3. Schreiber, acting as e3's agent, owed Plaintiffs the duty of a reasonably prudent certified public accountant and tax adviser, including the duty to perform reasonable due diligence before recommending a tax strategy, the duty to provide accurate information regarding the legal existence and operation of any tax credit recommended, and the duty to avoid recommending a strategy that exposes a client to civil and criminal penalties.

123. e3 breached those duties by, among other things: (a) representing that it had "completed [its] due diligence" on the Credits when, on information and belief, no competent due diligence had been or could have been performed because the Credits do not legally exist; (b) representing in writing that Mr. Schreiber was "near 100% certain on the tax credit acceptance by the IRS" without any reasonable basis; (c) recommending that Plaintiffs purchase the Credits as a tax strategy and claim them on a federal income tax return; and (d) collecting fees from Plaintiffs for that recommendation. No reasonably prudent CPA or tax adviser would have made those statements or that recommendation under the circumstances.

124. e3's breaches were a proximate cause of Plaintiffs' losses, including the $600,000 paid to White River, the $10,000 due-diligence fee paid to e3, consequential damages, professional fees, prejudgment interest, and tax-related amounts described above.

## COUNT XIII

### Breach of Fiduciary Duty and Constructive Fraud (Against Defendant e3)

125. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

126. Constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or to violate confidence and may arise out of a fiduciary or confidential relationship. A confidential relationship

exists where the parties do not deal on equal terms, since the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party. Investment advisers and tax advisers occupy such a relation.

127. A fiduciary or confidential relationship existed between Plaintiffs on the one hand and e3, Moriarty, and Schreiber on the other. e3 held itself out as Plaintiffs' "family office" and tax adviser; Mr. Schreiber held himself out as Plaintiffs' CPA; and Plaintiffs reposed trust and confidence in e3 to act for Plaintiffs' benefit in evaluating, recommending, and structuring tax strategies. e3 accepted that trust and confidence and was paid for its services.

128. e3 breached its fiduciary and confidential duties to Plaintiffs by, among other things: (a) failing to disclose its financial interest in placing Plaintiffs in the Transaction, including the commissions, fees, or other compensation e3 received or expected to receive from White River out of Plaintiffs' funds; (b) recommending a transaction that, on adequate due diligence, would have been known to be unlawful or at minimum to expose Plaintiffs to civil and criminal penalties; (c) misrepresenting the legal existence, validity, and source of the Credits; (d) misrepresenting that e3 had performed adequate due diligence; (e) failing to disclose conflicts of interest between e3's distribution arrangement with White River and Plaintiffs' interest in accurate, disinterested advice; and (f) using high-pressure sales tactics, including artificial deadlines and price-increase threats, to induce execution of the Transaction.

129. e3's breaches were a proximate cause of Plaintiffs' losses. Because e3's breaches arose out of and exploited a relationship of trust and confidence, Plaintiffs are also entitled to relief on a theory of constructive fraud.

## COUNT XIV

### Civil Conspiracy (Against All Defendants)

130. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

131. An actionable civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another, and damage results from the act or acts.

132. Defendants White River, Puchir, and e3 are a combination of two or more persons (and entities controlled by such persons) who, by concerted action, agreed to and did pursue the unlawful objective of marketing, selling, and retaining proceeds from the sale of purported federal income tax credits that did not legally exist, with the purpose of harming Plaintiffs and other purchasers. The agreement is evidenced by, among other things, the express marketing and distribution arrangement between White River and e3 acknowledged in the Addendum; e3's receipt of compensation from the Transaction; the coordinated promotional and contracting communications transmitted via the "NATC Operations Team" channel; and the joint efforts of Puchir and Moriarty to address and minimize purchaser concerns about IRS treatment.

133. Defendants' conduct constitutes one or more underlying torts, including fraud, fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, and constructive fraud, as set forth above. Plaintiffs have suffered damages as a direct and proximate result of Defendants' concerted action and are entitled to recover those damages jointly and severally from all Defendants, plus punitive damages under NRS 42.005.

## COUNT XV

**Aiding and Abetting Fraud (Against Defendant e3) (Pleaded in the Alternative)**

134. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

135. Under principles drawn from the Restatement (Second) of Torts § 876(b), a defendant is liable in tort if it "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."

136. In the alternative to Count XIV, e3 knew that White River and Puchir were perpetrating a fraud on purchasers of the Credits, or alternatively was on notice of facts giving rise to such knowledge, and provided substantial assistance and encouragement to White River's and Puchir's fraud by, among other things: (a) acting as White River's distribution partner and contractually undertaking to "establish a distribution network"; (b) using its position as Plaintiffs' trusted family office and CPA to identify, recruit, and recommend Plaintiffs as purchasers; (c) drafting and transmitting offering and tax-strategy materials reaffirming White River's misrepresentations; (d) deflecting Plaintiffs' concerns about IRS acceptance, regulatory approval, and White River's solvency; and (e) collecting compensation paid out of Plaintiffs' funds.

137. e3's substantial assistance was a but-for and proximate cause of Plaintiffs' losses. Plaintiffs are entitled to recover their damages from e3 jointly and severally with the other Defendants.

## COUNT XVI

### Unjust Enrichment (Against Defendant e3) (Pleaded in the Alternative)

138. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

139. Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.

140. In the alternative, Plaintiffs conferred a benefit on e3 in the form of fees and other compensation, including but not limited to the $10,000 "due diligence fee" and, on information and belief, additional commissions, referral payments, or other consideration paid to e3, directly or indirectly, out of the $600,000 Plaintiffs wired to White River. e3 appreciated, accepted, and retained those benefits.

141. Under the circumstances, it would be inequitable for e3 to retain those benefits because e3 obtained them by recommending and facilitating a Transaction that delivered nothing of legal value to Plaintiffs and exposed Plaintiffs to civil and criminal penalty risk. Plaintiffs are entitled to disgorgement and restitution of all compensation e3 received in connection with the Transaction, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Roman Zrazhevskiy and Tatiana Mironova respectfully request that this Court enter judgment in their favor and against Defendants White River Energy Corp., Jay Puchir, and e3 Tax, LLC d/b/a e3 Family Office, jointly and severally where appropriate, and grant the following relief:

A. Rescission of the Tax Credit Purchase Agreement and Addendum, and entry of judgment restoring Plaintiffs to the position they occupied prior to entering the Transaction;

B. Restitution of $600,000, plus all consequential losses caused by the Transaction, including but not limited to professional fees, accountants' and tax counsel's fees, IRS-assessed penalties and interest, and amounts paid in connection with any administrative or judicial proceeding involving the Credits;

C. Compensatory damages in an amount to be proven at trial, including all consequential, incidental, and reliance damages caused by Defendants' breaches and misrepresentations;

D. Punitive damages against Defendant White River Energy Corp. (and against Defendant Puchir to the extent he is found to be the alter ego of White River) and Defendant e3 Tax, LLC d/b/a e3 Family Office, on Counts VI, X, XIII, XIV, and XV, pursuant to NRS 42.005;

E. A declaration, under 28 U.S.C. §§2201-2202, that the Agreement is rescinded, void, and/or unenforceable; that Plaintiffs are not required to pursue or continue any IRS process or Tax Court proceeding as a condition of recovering their money; and that Defendant Puchir is the alter ego of White River;

F. Prejudgment and post-judgment interest at the maximum legal rate, including under NRS 17.130;

G. Plaintiffs' reasonable attorneys' fees and costs to the extent permitted by law, contract, or the Court's equitable authority; and

H. Such other and further relief, at law or in equity, as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: June 9, 2026

Respectfully submitted,

**REVISION LEGAL, PLLC**

*/s/ John Di Giacomo*

John Di Giacomo
Revision Legal, PLLC
444 Cass St., Suite D
Traverse City, MI 49684
(231) 714-0100
john@revisionlegal.com
Attorneys for Plaintiffs