**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ROMAN ZRAZHEVSKIY and**
**TATIANA MIRONOVA** **PLAINTIFFS**

**V.** **CASE NO. 5:26-CV-05135**

**WHITE RIVER ENERGY CORP.;**
**JAY PUCHIR; and e3 TAX, LLC d/b/a**
**e3 FAMILY OFFICE** **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now before the Court are Defendants White River Energy Corp. ("White River") and Jay Puchir's Motion to Dismiss and Memorandum Brief (Docs. 34 & 34-1); Defendant e3 Tax, LLC's ("e3") Motion to Dismiss (Doc. 37) and Memorandum Brief (Doc. 38); and the parties' respective Responses and/or Replies to the pending Motions (Docs. 36, 39, 41, 45). The Court held a Case Management Hearing on October 13, 2026, where it heard the parties' oral arguments and ruled from the bench on each Motion.[1] This Order memorializes the Court's rulings, taking each Motion in turn. To the extent the rulings in this Order differ from what was stated from the bench, this Order will control.

### I. FACTUAL BACKGROUND[2]

Plaintiffs Roman Zrazhevskiy and Tatiana Mironova are a married couple residing in Texas. (Doc. 27, ¶¶ 20–21). Defendant White River is a Nevada corporation

[1] The Court only took one issue—White River's request to dismiss the negligent misrepresentation claim against White River (Count VI) for failure to state a claim—under advisement. The issue is resolved in this Order.

[2] All facts are taken from the First Amended Complaint (Doc. 27) and, for the purposes of the Motions to Dismiss, are accepted as true.

headquartered in Fayetteville, Arkansas. *Id.* ¶ 23. On March 28, 2024, Mr. Zrazhevskiy signed a Tax Credit Purchase Agreement ("the Agreement") with White River to pay $600,000 for $1,000,000 in face value of so-called "Native American Tribe Trust Fund Federal Income Tax Credits" or "Tribal Tax Credits" ("Credits") that could be applied "dollar-for-dollar against their federal income tax liabilities." *Id.* ¶¶ 1, 33.

This sale was one of many White River made since 2023 when it and its Chief Financial Officer, Defendant Jay Puchir, began marketing and promoting the Credits as "valid federal income tax credits purportedly issued by the U.S. Treasury to a Native American tribe"—the Cherokee Nation—"and acquired by White River through a joint venture." *Id.* ¶¶ 28–29. White River and Mr. Puchir "disseminated purchaser-facing materials" while marketing the Credits that included various representations about their validity, transferability, and Cherokee Nation-origins. *Id.* ¶ 30. These materials also indicated "that the Credits had been registered with the U.S. Treasury and were supported, or would be supported, by legal and IRS review" and assured that "White River would indemnify purchasers if the IRS rejected the Credits." *Id.*

Plaintiffs first learned about the opportunity to purchase the Credits from e3, a tax servicer based out of Kirkwood, Missouri. At the time, the couple were e3's clients; it "acted as Plaintiffs' tax and financial adviser, introduced and recommended the Credits as a tax-mitigation strategy, and represented that it had performed due diligence on them." *Id.* ¶ 53. On December 19, 2023, Plaintiffs had received an email from e3's client service coordinator that made several claims about the Credits regarding their sourcing (the

Cherokee Nation) and where the authority for them could be found in the Internal Revenue Code ("Title 25, Chapter 4, Subchapter 3, Section 161A"[3]). *Id.* ¶ 54.

Four days prior to sending Plaintiffs that email, e3 had signed a nondisclosure agreement ("NDA") with White River and contemporaneously participated in a due-diligence call. *Id.* ¶ 59. Mr. Puchir and the CEO of White River's subsidiary, White River Private Capital Management ("WRPCM"), participated on behalf of White River during the call; after the call, "e3 was granted access to White River's confidential data room containing a form Tax Credit Purchase Agreement and wire instructions." *Id.*

A few days after the initial invitation for its clients to purchase the Credits, e3's president John E. Moriarty sent Mr. Zrazhevskiy a written summary of the December 15 due-diligence call that relayed various representations made by Mr. Puchir and White River. *Id.* ¶ 60. The statements largely echoed previous representations regarding the sourcing and validity of and authority for the Credits—White River had entered into a joint venture agreement in which it obtained millions[4] of authorized Tribal Tax Credits from the Cherokee Nation. *See id.* The summary also relayed that Mr. Puchir said "20-25% of the $50 Million has been spoken for" as of December 15; that White River was "not looking to advertise the existence" of the Credits and White River's partnership with the Cherokee Nation; and that White River was going to "indemnify all investors [ ] if any tax credits are

---

[3] "Title 25 of the United States Code is the Indian-Affairs title, not the Internal Revenue Code, and no 'Section 161A' of Title 25 authorizes the 'Native American Tribe Trust Fund Tax Credit.'" (Doc. 27, ¶ 54).

[4] The FAC is unclear on exactly how many millions of dollars in Credits White River obtained. Paragraph 60 includes alleged quotes from an email sent by e3 saying that White River obtained "$500,000,000" worth of Credits but later includes quotes indicating White River had "$50 Million" in Credits.

not accepted by the IRS" and was proactively working to hire a law firm that would obtain a "private letter ruling from the IRS" as to the Credits' validity. *Id.*

Plaintiffs received another email about the Credits on December 26, 2023, from Mark C. Schreiber, e3's "Senior Partner & Registered Representative." *Id.* ¶ 55. In the email, Mr. Schreiber "recommend[ed] that Plaintiffs purchase the Credits," represented that e3 had "completed [its] due diligence and [was] ready to move forward," emphasized that it was "very rare" for e3 "to have access to this at a 50% discount," and instructed its clients they should select the "'amount [they] want' and execute documents via DocuSign." *Id.* The email further stated that e3 was "charging a due diligence fee of $10,000 for 3 units or more. This will be our total compensation." *Id.*

When Mr. Zrazhevskiy "expressed concern about 'the risk [of] White River going out of business in the scenario the tax credits are not approved by the IRS and White River not being able to pay back the investment,'" Mr. Schreiber emailed e3's President Mr. Moriarty with Mr. Zrazhevskiy copied on January 8, 2024. *Id.* ¶ 56. Mr. Schreiber wrote that he had told Mr. Zrazhevskiy he was "very comfortable with White River based on our due diligence and near 100% certain on the tax credit acceptance by the IRS." *Id.*

From January 2024 until Mr. Zrazhevskiy's purchase was finalized in March 2024, Mr. Moriarty continued to "transmit[ ] misrepresentations" to Mr. Zrazhevskiy via text message about his confidence in the Credits' validity and the indemnity protections for purchasers. *See id.* ¶ 57. During this period, e3 signed an NDA with WRPCM where e3 agreed to "build out a network of distribution partners capable of educating prospective purchasers regarding the Credits and providing due-diligence information to purchasers and their financial professionals." *Id.* ¶ 52. Upon securing an interested purchaser, e3

would then "facilitate[ ] preparation and execution of transaction documents, transmit[ ] White River's wire instructions, and assist[ ] with delivery of the purchaser's Credit certificate." *Id.*

"[I]n reliance on Defendants' representations," Mr. Zrazhevskiy decided to sign the Agreement on March 28, 2024. *Id.* ¶ 33. e3 originated and transmitted to Mr. Zrazhevskiy a single DocuSign envelope that contained three documents: the Agreement, a Mutual Non-Disclosure Agreement, and the Addendum that fixed the pricing at "$60,000 per unit for $100,000 in face-value Credits." *Id.* ¶¶ 34, 41.

Section 3 of the Agreement includes White River's various representations and warranties regarding the Credits, namely that White River owned the Credits, had exclusive right to sell and transfer them, and that there was nothing threatening the legality of the sale. *See id.* ¶ 36. Section 5 of the Agreement contained two indemnity provisions. Section 5.1(a) provides general indemnity for breach of the Agreement, and Section 5.1(b) provides that "the Seller will indemnify, defend and hold harmless the Buyer in the event that the U.S. Internal Revenue Service . . . makes a final binding determination, and the United States Tax Court confirms such determination in whole or in part and the times to appeal have expired, that the Credits are not 100% valid resulting in any losses to Buyer, including without limitation by virtue of any disallowance or recapture with respect to the Credits." *Id.* ¶ 37. And Section 9 of the Agreement contains a Nevada choice-of-law and Washington County, Arkansas, exclusive-jurisdiction clause.[5] *Id.* ¶ 39.

[5] Section 10 of the NDA also included a forum selection clause identifying Washington County, Arkansas, as the exclusive forum. *Id.* ¶ 41.

After Mr. Zrazhevskiy signed the documents, Plaintiffs then paid the full $600,000 by wire transfer to White River's bank account in two installments sent on April 4 and April 5, 2024. *Id.* ¶ 40. White River confirmed receipt on April 8. *Id.*

Following the purchase, "e3 continued to serve as Plaintiffs' tax adviser, family office, and accountant and prepared Plaintiffs' joint 2023 federal income tax return claiming the White River Credits. The return reflected a $995,767 claimed refund attributable to the Credits, which, on e3's advice, Plaintiffs applied forward as an estimated payment toward their 2024 federal income tax liability rather than receiving as a cash refund." *Id.* ¶ 65.

Without Plaintiffs' awareness, issues with the Credits emerged in November 2024. *Id.* ¶¶ 66–67. On November 11, 2024, the IRS issued a tax-credit-discrepancy notice (Notice CP23) for Plaintiffs' 2023 tax year filings. *Id.* ¶ 67. The notice "disallowed the $1,000,000 in Credits Plaintiffs had claimed and assessed a balance due of $9,706.90." *Id.* Plaintiffs contend that e3 was notified of this formal IRS disallowance prior to preparing and internally circulating a 2024 tax projection for Mr. Zrazhevskiy and Ms. Mironova on November 20, 2024. *Id.* ¶¶ 66–67. When Mr. Schreiber sent the finalized projection to Mr. Zrazhevskiy days later, he did so "without disclosing e3's internally documented concerns about the White River Credits or the resulting effect on Plaintiffs' 2023 and 2024 tax positions." *Id.* ¶ 68. Rather, Mr. Schreiber "immediately solicited Plaintiffs to participate in another fee-generating tax strategy, Here2There, emphasizing that the opportunity was filling up and closing soon." *Id.*

On Plaintiffs' behalf—but still without disclosing to them the issue—e3 sent an intervening letter to the IRS in December 2024 that "attempted to defend the Credits

against CP23." *Id.* ¶ 67. However, subsequent communications from the IRS sent the following year "confirm that the CP23 disallowance was correct and that e3's post-CP23 defense of the Credits was unsuccessful." *Id.*

News of the Credits' supposed invalidity began to circulate. The U.S. Department of the Treasury issued a public statement that "no such credits exist." *Id.* ¶ 43. The Cherokee Nation also spoke out, "affirmatively disavow[ing] any association with the Credits" and issuing "a cease-and-desist letter stating that it 'did not authorize and is not associated with these tax credits' and was working with state and federal authorities to prevent further harm."[6] *Id* ¶¶ 43–44. The IRS on March 21, 2025, confirmed in writing to the U.S. Senate Committee on Finance that "'these tax credits do not exist' and warned that taxpayers claiming nonexistent credits may be subject to penalties and examination." *Id.* ¶ 42. And U.S. Senators Ron Wyden and Catherine Cortez Mastro sent a letter to the Acting IRS Commissioner on April 14, 2025, "calling on the IRS to initiate a criminal investigation of the promoters of the tribal tax-credit scheme." *Id.* ¶ 77. The letter identified e3 and White River by name among the list of alleged promoters. *Id.* On April 16, 2025, White River issued a public press release, and Mr. Puchir made public statements in defense of the Credits. *Id.* ¶¶ 79, 80.[7]

---

[6] Plaintiffs contend that White River received its own "formal cease-and-desist letter demanding that White River stop representing the Cherokee Nation as the source, sponsor, or authorizer of the Credits. That cease-and-desist letter has been referenced in contemporaneous communications from successor tax counsel evaluating White River's tribal tax-credit program." *Id.* ¶ 44.

[7] The sale of the Credits has also "prompted federal investigation and related enforcement scrutiny" by both the U.S. Department of Justice and IRS Criminal Investigation Unit. *Id.* ¶ 45. Such investigations appear to remain ongoing at the time of this Order.

On April 18, 2025, Plaintiffs received their first "substantive disclosure of the IRS's rejection of the Credits and the federal government's position that the Credits do not exist . . . when Hale Sheppard of Eversheds Sutherland, whom e3 had retained to represent Plaintiffs in IRS matters concerning the Credits," sent the couple an email about the various statements from the Treasury, IRS, and the Cherokee Nation. *Id.* ¶ 77. Over five months had passed since the IRS had issued the November 2024 discrepancy notice; e3 had never "disclosed IRS Notice CP23, nor its existence, nor its substance, nor its arithmetic consequences" during that period. *Id.* ¶¶ 67, 71. Mr. Moriarty of e3 sent Plaintiffs a follow up email also on April 18, 2025, that contained "additional material misrepresentations, apparently designed to minimize Sheppard's disclosure and to prevent Plaintiffs from taking further steps against e3 or White River." *See id.* ¶ 72.

Plaintiffs received a mass client communication from e3 on September 9, 2025, that contained what they believe are "material admissions confirming e3's contemporaneous knowledge that the Credits were failing." *Id.* ¶ 73. The email acknowledged that some of e3 clients' Credits were disallowed by the IRS and that e3 was "waiting for the outcome of White River's private letter ruling (PLR) application with the IRS," which had been filed on July 14, 2025. *Id.*

On or about October 6, 2025, Plaintiffs then received a notice from the IRS of a balance due (Notice CP14) "assessing tax, penalties, and interest against Plaintiffs' joint 2023 federal income tax return arising from the disallowance of the Credits." *Id.* ¶ 74. They forwarded the notice to e3, asking, "Is this a penalty for the issue with White River? If so, White River should cover this with their insurance, correct?" *Id.* Mr. Moriarty

responded the next day, "confirming that the IRS matter concerned the 'continued process of challenging the disallowance of your 2023 tax credits.'" *Id.*

Plaintiffs ultimately "demanded rescission of the Agreement, return of the $600,000 purchase price, and payment of all additional amounts necessary to make them whole" from White River on April 16, 2026. *Id.* ¶ 46. Their request was denied. *Id.* White River's outside general counsel Brian Ettinger sent a response on April 29, 2026, that "acknowledged that the IRS had rejected Plaintiffs' claim of the Credits but maintained that Plaintiffs should continue pursuing the Credits through IRS administrative and judicial processes while White River pursued its own 'legal and political efforts.'" *Id.* The couple's tax counsel gave them the opposite advice; they were instructed to "pay the outstanding tax and withdraw any pending IRS process" because "further submissions asserting the Credits could be treated as frivolous and subject Plaintiffs to additional penalties under the Internal Revenue Code." *Id.* ¶ 47.

Plaintiffs received another letter from Mr. Ettinger on May 15, 2026, that again denied their demand for recission. *Id.* ¶ 48. That letter included "additional material admissions" about the Credits and e3's role in sale of the Credits. *Id.* Namely, the letter stated that "e3 had collected commissions and tax-planning fees totaling between $5 million and $10 million from Plaintiffs and other purchasers [ ] and that White River reserved contribution and indemnity claims against e3 and Moriarty for their purchaser facing distribution, diligence, and tax-support activities." *Id.*

Pursuant to the forum selection clauses in the Agreement and NDA, Plaintiffs ultimately filed an initial complaint with this Court on June 9, 2026. *See* Doc. 2. They filed the First Amended Complaint ("FAC") (Doc. 27) on August 20, 2026. Including those pled

in the alternative, Plaintiffs assert fifteen total causes of action against White River, Mr. Puchir, and e3:

- Count I: Breach of Contract against White River.
- Count II: Breach of Express Warranty against White River.
- Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing against White River.
- Count IV: Unjust Enrichment/Restitution against White River, Mr. Puchir, and e3.
- Count V: Fraud in the Inducement against White River.
- Count VI: Negligent Misrepresentation against White River.
- Count VII: Alter Ego/Piercing the Corporate Veil against Mr. Puchir.
- Count VIII: Declaratory Judgment against White River and Mr. Puchir.
- Count IX: Fraud/Fraudulent Misrepresentation against e3.
- Count X: Negligent Misrepresentation against e3.
- Count XI: Professional Negligence/Accountant Malpractice against e3.
- Count XII: Breach of Fiduciary Duty and Constructive Fraud against e3.
- Count XIII: Civil Conspiracy against White River, Mr. Puchir, and e3.
- Count XIV: Aiding and Abetting Fraud against e3.
- Count XV: Unjust Enrichment against e3.

Doc. 27, ¶¶ 81–159.

White River and Mr. Puchir filed a joint Motion to Dismiss, seeking to dismiss each claim against them either in full or in part for failure to state a claim. (Doc. 34). e3 filed a

Motion to Dismiss for lack of personal jurisdiction, or in the alternative, failure to state a claim. (Doc. 37).

## II. WHITE RIVER AND JAY PUCHIR'S MOTION TO DISMISS

### A. Legal Standard[8]

To avoid a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. At the pleading stage, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). A pleading containing mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). "When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001). "The issue in considering such

---

[8] White River and Jay Puchir filed the instant Motion to Dismiss and their Answer to the FAC on the same day. *See* Docs. 34 & 35. Therefore, Plaintiffs argue that their Motion should be converted into a Rule 12(c) Motion for Judgment on the Pleadings. (Doc. 36, p. 9). In any event, 12(c) motions are governed by the same legal standard that applies to motions to dismiss under Rule 12(b)(6). *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

a motion is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to present evidence in support of the claim." *Ward v. Ark. Dep't of Fin. & Admin.*, 2020 WL 4032138, at *2 (W.D. Ark. July 16, 2020) (citing *Nusku v. Williams*, 490 U.S. 319, 327 (1989)).

**B. Discussion**

White River and Mr. Puchir's Motion to Dismiss (Doc. 34) is a "narrowing motion"; they "do not seek dismissal of Count I's core breach-of-contract theory," but they do ask the Court to fully dismiss certain claims and dismiss others in part. (Doc. 34-1, p. 2). Defendants move to (1) dismiss all claims against Mr. Puchir (Counts IV, VII, VIII, and XIII) and (2) dismiss Ms. Mironova as Plaintiff from Counts I–III. Defendants further scrutinize the claims against White River, arguing that some should be fully dismissed as duplicative or inconsistent, some should be narrowed, and some fail to state a claim outright. This Order takes up these requests in turn.

***1. Dismissal of All Claims Against Jay Puchir***

Plaintiffs name Mr. Puchir as a Defendant in four causes of action: Count IV, Unjust Enrichment; Count VII, Piercing the Corporate Veil/Alter Ego; Count VIII, Declaratory Judgment; and Count XIII, Civil Conspiracy. Plaintiffs confirmed at the hearing that they do not assert that Mr. Puchir is individually liable on these claims but rather seek to pierce the corporate veil and establish liability on a derivative basis.

**a. Alter-Ego/Piercing the Corporate Veil (Count VII)**

Mr. Puchir argues that Plaintiffs fail to allege sufficient facts to establish that he acted as the alter ego of White River, so Count VII should be dismissed.

To hold a corporate officer liable for the debts and/or liabilities of a corporation, Nevada law[9] requires that (1) the corporation be "influenced and governed by the person"; (2) "[t]here is such unity of interest and ownership that the corporation and the person are inseparable from each other"; and (3) "[a]dherence to the notion of the corporation being an entity separate from the person would sanction fraud or promote a manifest injustice." N.R.S. § 78.747. An officer's relative control over a corporate entity alone is insufficient to find alter ego because "merely influencing and governing a corporation does not necessarily demonstrate the unity of interest and ownership resulting in the requisite inseparability of a corporation and shareholder." *Wyatt v. Bowers*, 747 P.2d 881, 883 (Nev. 1987). Courts may consider the following nonconclusive factors when deciding whether unity of interest and ownership exists: "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." *See LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 847 (Nev. 2000).

The factual allegations regarding Mr. Puchir's role as White River's alter ego are primarily laid out in Paragraphs 122 through 128 of the FAC. *See* Doc. 27. Plaintiffs allege that Mr. Puchir "influence[s] and govern[s]" White River and "exercises practical control over the corporation's day-to-day operations and disposition of its funds" through tasks like controlling the corporate bank account, signing material agreements, and controlling investor communications. *Id.* ¶ 122. Plaintiffs further allege that Mr. Puchir and White River's interests are so aligned that they are "inseparable," and that Mr. Puchir is responsible for White River disregarding corporate formalities and becoming

[9] The Parties appear to agree in their briefings that Nevada governs this claim.

undercapitalized and SEC-delinquent. *Id.* ¶ 123. As to undercapitalization, the FAC specifies that "White River's aggregate Credits-sale proceeds may exceed $100 million, while White River's SEC-disclosed operating assets, before its cessation of periodic reporting, were a small fraction of that amount." *Id.* ¶ 127. On Plaintiffs' "information and belief," the FAC further states that "through his control over White River's bank accounts and disbursement authority, [Mr. Puchir] has caused corporate funds received from Credits purchasers to be commingled with, and diverted to, insiders and related-party entities including entities in which Puchir has or had a personal financial interest, leaving White River without the wherewithal to satisfy refund obligations to purchasers such as Plaintiffs." *Id.*

The Motion largely concerns whether Plaintiffs pled sufficient facts to satisfy the second element of Nevada's alter-ego statute, "unity of interest and ownership." Mr. Puchir argues that Plaintiffs "plead [his] control" but provide only improperly conclusory "facts" to establish that he and White River are inseparable. (Doc. 34-1, p. 8). Beyond "titles and common executive authority," Mr. Puchir contends that Plaintiffs' only other facts establishing White River as Mr. Puchir's alter ego are "'on information and belief' speculations of imagined beneficial ownership, commingling, diversion, and undercapitalization." *Id.* He argues: "The 'commingled,' 'diverted,' and 'undercapitalized' averments are the labels of the standard, not facts, and get no presumption of truth" under *Iqbal*. *Id.*

Here, the Court agrees that Plaintiffs "plead Mr. Puchir's control" over White River and further finds that such allegations sufficiently establish he plausibly "influenced and governed" the company. In his role as White River's CFO, Mr. Puchir has direct

involvement in the company's daily operations; controls White River's funds, transactions, and bank accounts; and signs agreements and makes various statements on White River's behalf.

But the Court disagrees that Plaintiffs only plead facts regarding Mr. Puchir's "control." The FAC alleges the existence of essentially all factors—commingling, undercapitalization, diversion of funds, failure to observe corporate formalities—weighing toward the Court determining that White River and Mr. Puchir are unified in interest and ownership. Mr. Puchir argues the allegations are impermissibly conclusory, but his position understates the facts Plaintiffs allege and overstates what the Eighth Circuit's reading of *Iqbal* demands at the pleading stage.

In Paragraph 127 of the FAC, Plaintiffs allege that the Senate Finance Committee's investigation points to White River's assets being insufficient to cover any potential debts arising from its sale of the Credits. Plaintiffs then allege that White River's suspected inability to satisfy any refunds or other liabilities arising from the Credits is the result of Mr. Puchir using the White River's bank accounts to commingle and divert funds. These facts together provide more than a threadbare accusation of "undercapitalization" and "diversion."

To the extent Mr. Puchir takes issue with Plaintiffs pleading "on information and belief," claims pled as such "are not categorically insufficient to state a claim." *See Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023). "If such allegations are based on information that is within the possession and control of the defendant or are supported by sufficient factual material that makes the inference of culpability plausible," factual allegations pled on a claimant's information and belief "are

permissible under *Twombly* and *Iqbal*." *Id.* at 955. Much of the information pertaining to Count VII's alter ego claim is expectedly going to be within Mr. Puchir and White River's control and inaccessible to Plaintiffs prior to discovery. And there are sufficient factual allegations in Paragraphs 122 through 128 that make the inference of alter ego plausible.

Therefore, since the Court further finds that Plaintiffs allege a sufficient connection between Mr. Puchir's alleged misuse of White River's corporate form and their injuries,[10] the FAC pleads a plausible alter-ego claim. Accordingly, the Court **DENIES** the Motion to Dismiss as to Count VII.

**b. Unjust Enrichment (Count IV), Declaratory Judgment (Count VIII), and Civil Conspiracy (Count XIII)**

Mr. Puchir's arguments for dismissal of the other claims against him are largely predicated on the Court finding against Plaintiffs on their alter-ego claim: If Count VII is dismissed, dismissal of the other claims would necessarily follow because the FAC contains no allegations of Mr. Puchir's actions beyond those he took while in his corporate role. *See* Doc. 34-1, pp. 5–12.

Therefore, since Count VII survives and the Court finds no other reason to dismiss the remaining counts at the pleading stage, the Motion as to dismissing Mr. Puchir from Counts IV, VIII, and XIII is **DENIED.**

***2. Dismissal of Plaintiff Tatiana Mironova from Counts I–III***

[10] The FAC alleges, "But for Puchir's use of the corporate form to promote and sell purported federal tax credits that do not legally exist while diverting the proceeds beyond the reach of purchasers, Plaintiffs would have a solvent counter-party from which to recover the $600,000 they wired." (Doc. 27, ¶ 128).

Plaintiffs bring three claims against White River arising out of its alleged breach of the Agreement: Count I, Breach of Contract; Count II, Breach of Express Warranty; and Count III, Breach of the Implied Covenant of Good Faith and Fair Dealing.

As Exhibit A attached to the FAC indicates, Mr. Zrazhevskiy alone signed the Agreement. As such, since Ms. Mironova is a non-signatory who cannot enforce any obligations, rights, or duties created by the Agreement, White River argues that she must be dismissed as a plaintiff from the first three claims. (Doc. 34-1, pp. 12–14).

In their response, Plaintiffs confirm that Ms. Mironova did not sign the Agreement and cannot "enforce White River's express contractual obligations" but concede only that it "affects her ability to recover under Counts I and II." (Doc. 36, p. 27). However, Plaintiffs' counsel later clarified and agreed at the Case Management Hearing that Ms. Mironova also cannot bring Count III's implied covenant-of-fair-dealing claim.

Therefore, the Court **GRANTS IN PART** White River's Motion to Dismiss and **DISMISSES** Ms. Mironova as a Plaintiff for Counts I, II, and III. Only Mr. Zrazhevskiy can be the named Plaintiff for these claims.

### *3. Claims Against White River*

Plaintiffs name White River as a Defendant in eight claims, and White River's Motion scrutinizes each.

#### a. Breach of Contract (Count I)

White River argues it does not seek to dismiss Count I outright but rather seeks "dismissal or a stay on the distinct theory that Whtie River breached by 'failing . . . to indemnify Plaintiffs upon the IRS's effective rejection of the Credits,'" as the FAC alleges. (Doc. 34-1, p. 30). Its argument turns on the parties' differing interpretations on whether

Section 5.1(b) of the Agreement's indemnification provision has been triggered by the IRS's "effective rejection" of Plaintiffs' purchased Credits.

The Court need not take up the parties' positions on this issue because it finds that White River's Motion advances merits-related arguments that are inappropriate to take up at the pleading stage. The Court declines to entertain White River's "narrowing" arguments at this point, and the Motion is **DENIED** as to dismissing or staying Plaintiffs' indemnity theory in Count I.[11]

### b. Breach of Express Warranties (Count II), Breach of Implied Covenant of Good Faith and Fair Dealing (Count III), and Unjust Enrichment (Count IV)

White River takes issue with claims being either duplicative (Counts II and III) or inconsistent (Count IV) with Count I's breach of contract claim.

But Plaintiffs plead Count II, Count III, and Count IV all in the alternative to Count I, as federal pleading standards expressly permit them to do. *See* Fed. Rule Civ. Pro. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.") and 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

[11] In support of their arguments against Count I's partial dismissal, Plaintiffs' Response largely relies on statements contained in a letter White River's outside general counsel sent to them on May 15, 2026 (the "Ettinger Letter"). Plaintiffs moved for the Court to take judicial notice of the Ettinger Letter, or in the alternative, consider it embraced by the pleadings. *See* Doc. 44. The Court told the parties at the Case Management Hearing that it would deny taking judicial notice but would otherwise treat the Ettinger Letter as being embraced by the pleadings insomuch as it is referred to in the Court's findings. The Court did not need to consider the Ettinger Letter in issuing this Order, and therefore the request to consider the letter as embraced by the pleadings is rendered **MOOT.**

Plaintiffs may therefore plead overlapping and/or inconsistent theories of both liability and recovery; White River's concern of double recovery is inappropriate to consider at this point. To the extent that White River argues dismissal of Counts II, III, or IV on any other basis besides duplicity or inconsistency, the Court finds that Plaintiffs allege sufficient facts permitting the claims to survive beyond pleading stage. Accordingly, White River's Motion to Dismiss as to Counts II, III, and IV is **DENIED.**

**c. Fraud in the Inducement (Count V) and Civil Conspiracy (Count XIII)**

Count V identifies nine alleged misrepresentations that White River either inserted into Section 3 of the Agreement or "were communicated to Plaintiffs through the purchaser-facing material and communications." *See* Doc. 27, ¶¶ 103–04. For the second category of statements, the FAC states that "Plaintiffs allege those statements against White River only to the extent White River made, supplied, authorized, approved, or ratified them." *Id.* ¶ 104.

Pursuant to Rule 9(b)'s special pleading requirements, White River asks the Court to "narrow" Count V by dismissing the claim to the extent it is based on any representations not expressed in the Agreement. *See* Doc. 34-1, pp. 18–28. It advances this argument on several fronts, such as improper or insufficient attribution of these statements to White River and/or certain provisions in the Agreement foreclosing liability. Furthermore, White River argues that Count XIII's civil conspiracy claim should be dismissed "to the extent it is predicated on a fraud theory dismissed under Rule 9(b)." *Id.* at p. 11.

The Court finds that the type of finely tuned parsing White River requests in its Motion is inappropriate at this stage. A cause of action has been plausibly pled pursuant

to Rule 9(b); which statements can be properly attributed to White River and/or are viable for establishing liability are inquiries more properly reserved for subsequent motions. The Court finds that Plaintiffs plead sufficient facts for each element of fraud in the inducement to satisfy Rule 9(b) and rejects any of White River's arguments for dismissal of Count V. Therefore, White River's Motion to Dismiss as to Counts V and Count XIII is **DENIED**.

**d. Negligent Misrepresentation (Count VI)**

Despite Section 9 of the Agreement identifying Nevada as the governing law, White River contends that there is a "tort choice-of-law question" that "is genuinely contestable" regarding Count VI. (Doc. 34-1, p. 28). White River argues that "Section 9 does not, on its narrower reading, reach a free-standing negligent misrepresentation tort — as distinct from the fraud-in-the-inducement claim in Count V, which concerns the Agreement's execution and validity and is governed by Nevada." *Id.* Therefore, the Court should apply Arkansas's choice-of-law rules, and under those rules, "Arkansas law is at least a serious candidate . . . because the alleged misrepresentations issued from White River's Arkansas headquarters." *Id.* And "[i]f Arkansas law governs, Count VI fails outright because Arkansas has declined to recognize the tort." *Id.* (citing *South County, Inc. v. First W. Loan Co.*, 315 Ark. 722, 725–26 (Ark. 1994)). Plaintiffs assert that, just as it embraces Count V's fraud claim, Section 9 of the Agreement governs Count VI because it "selects Nevada substantive law for any dispute concerning the Transaction." (Doc. 36, p. 20).

The Court provisionally finds that Nevada, not Arkansas, law appears to govern Count VI. How, as White River argues, Count VI is "distinct" from Count V is unclear when Count VI is pled in the alternative to the fraud claim and thus concerns the same identified misrepresentations that allegedly induced Plaintiffs to enter into the Agreement. *See* Doc.

27, ¶¶ 116–19. As Plaintiffs contend, Count VI can thus be reasonably considered as a "dispute . . . relating to [the Agreement's] execution [and] its validity" that is embraced by Section 9.

Even if Nevada law applies, White River still argues that Count VI should be dismissed.

Nevada recognizes the tort of negligent misrepresentation and adopts the Restatement (Second) of Torts § 552, which states: "One who, in the course of his business, profession or employment, or in any other [trans] action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *See Bill Stremmel Motors, Inc. v. First Nat'l Bank of Nev.*, 575 P.2d 938, 940 (Nev. 1978). White River argues that Plaintiffs fail to allege that White River made any misrepresentations "for the guidance of others"; they "plead [no] information [that White River] supplied in a professional-information capacity distinct from White River's role as the seller and contracting counterparty." (Doc. 34-1, p. 29).

Plaintiffs maintain that the FAC pleads sufficient facts to show that White River made misrepresentations to guide buyers like Plaintiffs as they decided whether to purchase the Credits. Plaintiffs argue the FAC asserts that White River made both contractual warranties and "purchaser-facing, pre-contract representations . . . concerning external governmental authorization, registration, filing treatment, and legal

support. . . . White River expected and intended purchasers such as Plaintiffs to use that information in deciding whether to buy the Credits." (Doc. 36, pp. 21–22).

After reviewing the parties' briefings on the application of Nevada law and considering their arguments at the Case Management Hearing, the Court finds that Plaintiffs allege a plausible factual basis for negligent misrepresentation and advance potentially viable theories of liability. Therefore, at the pleading stage, the Court **DENIES** White River's Motion to Dismiss as to Count VI.

**e. Declaratory Judgment (Count VIII)**

Count VIII asks, in part, for the Court to declare that "the Agreement does not require Plaintiffs, as a contractual prerequisite to obtaining relief from White River, to pursue or continue any IRS administrative process, Tax Court proceeding, refund claim, or appeal as a condition of recovering their money." (Doc. 27, ¶ 132(c)). White River argues that the Court should dismiss "Count VIII to the extent it seeks a declaration with respect to federal taxes, IRS procedures, or Tax Court obligations" because the Declaratory Judgment Act prohibits the Court from doing so. (Doc. 34-1, pp. 29–30); *see* 28 U.S.C. § 2201(a) (carving out an exception to the Declaratory Judgment Act "with respect to Federal taxes other than actions brought under section 7348"). Though White River is correct that the Court cannot enter declarations on such matters, the Court agrees with Plaintiffs that Count VIII does not explicitly make such a request. Accordingly, White River's Motion to Dismiss as to Count VIII is **DENIED**. The Court does not intend to run afoul of the Declaratory Judgment Act and will not try to opine about the tax code.

### C. Conclusion

For the reasons explained above, **IT IS THEREFORE ORDERED** that White River and Jay Puchir's Motion to Dismiss (Doc. 34) is **GRANTED IN PART AND DENIED IN PART**. All claims against White River and Mr. Puchir survive, and Ms. Mironova is dismissed as a Plaintiff from Counts I, II, and III.

## III. e3's MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Missouri-based e3 argues that the Court should dismiss each of the eight claims asserted against it for lack of personal jurisdiction. *See* Docs. 37, 38. In their Response in Opposition, Plaintiffs primarily advance two theories supporting their argument that this Court has personal jurisdiction over e3: (1) that e3 made sufficient minimum contacts with the forum to establish specifical personal jurisdiction as a matter of due process and/or (2) the forum selection provision in the Agreement also binds e3 under the "closely related" doctrine as outlined in *Marano Enterprises of Kansas v. Z-Teca Restaurants, L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (citations omitted). *See* Doc. 39, pp. 8–17. Alternatively, if the Court does not outright dismiss e3's motion, Plaintiffs request that the Court grant them leave to take tailored jurisdictional discovery. *Id.* at pp. 17–18; *see Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008) (granting plaintiff leave to take jurisdictional discovery to establish personal jurisdiction over defendant when record reflected that plaintiff "offered documentary evidence, not merely speculations or conclusory allegations" about the defendant's contacts with Arkansas).

As it ruled after considering the parties' briefings and arguments at the Case Management Hearing, the Court finds that Plaintiffs plead enough facts that entitle them to engage in limited jurisdictional discovery.

**IT IS THEREFORE ORDERED** that the Court **DEFERS RULING** on e3's Motion to Dismiss for lack of personal jurisdiction and **GRANTS LEAVE** to Plaintiffs to take jurisdictional discovery. The jurisdictional discovery shall be limited to five topics:

1. The formation, terms, and performance of e3's contractual and business relationships with White River and its related entities.

2. e3's knowledge of and involvement in preparing, reviewing, or transmitting the Agreement and, within that, the Arkansas forum selection provision.

3. e3's participation in marketing, documenting, closing, and administering the transaction involving Plaintiffs.

4. The nature, frequency, and substance of e3's suit-related communications and other contacts with persons or entities located in Arkansas.

5. e3's contractual entitlement to and receipt of compensation or benefits arising from White River's transaction with Plaintiffs.

The Court temporally limits discovery to matters stemming from Fall 2023 through Plaintiffs' filing of the FAC on August 20, 2026.

At the Case Management Hearing, the Court granted Plaintiffs 120 days to complete the jurisdictional discovery. However, there has been a delay in the Court's issuance of a Protective Order, so the **jurisdictional discovery deadline is extended to March 1, 2027.** On **March 16, 2027**, fifteen days after the conclusion of jurisdictional discovery, the parties must simultaneously file **supplementary briefs** not to exceed ten pages in length, re-addressing the matter of personal jurisdiction with the updated factual record.

In the alternative to seeking dismissal for lack of personal jurisdiction, e3 seeks to dismiss various claims for failure to state a claim. The Court further **DEFERS RULING** on e3's Motion to Dismiss as to its 12(b)(6) arguments for dismissal.

**IT IS SO ORDERED** on this 18th day of November, 2026.

______________________________
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE